## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, DISTRICT OF COLUMBIA, STATE OF ILLINOIS, COMMONWEALTH OF MASSACHUSETTS, DANA NESSEL on behalf of the PEOPLE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH CAROLINA, COMMONWEALTH OF PENNSYLVANIA, and STATE OF VERMONT, | 21 Civ. 536 <br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF LABOR; AL STEWART, *in his official capacity as Acting Secretary of Labor*, | |
| Defendants. | |

## INTRODUCTION

1.     This lawsuit challenges a Trump Administration regulation that produces a sea change in labor law by unlawfully expanding the religious exemption for federal contractors under Executive Order 11,246, weakening anti-discrimination protections for workers, and prompting an increase in employment discrimination and its attendant effects.  *Implementing Legal Requirements Regarding the Equal Opportunity Clause's Religious Exemption*, 85 Fed. Reg. 79,324 (Dec. 9, 2020) (to be codified at 41 C.F.R. §§ 60–1.3, 1.5) (the "Final Rule").

2.      For more than fifty years, Executive Order 11,246 ("E.O. 11,246" or "Order") has protected employees of federal contractors and subcontractors from workplace discrimination. President Lyndon B. Johnson signed the Order one year after passage of Title VII of the Civil Rights Act of 1964 to ensure that the federal government would not tolerate tax-payer funded discrimination against its contracted workforce.

3.      Today, E.O. 11,246, as amended, prohibits federal contractors from discriminating against their employees on the basis of race, color, religion, sex, sexual orientation, gender identity, or national origin.  Exec. Order No. 11,246, § 202.  Its protections are implemented through DOL's Office of Federal Contract Compliance Programs ("OFCCP") whose mission is to "hold[] those who do business with the federal government (contractors and subcontractors) responsible for complying with the legal requirement to take affirmative action and not discriminate . . . ."[1]

4.      Since 2002, the protections of E.O. 11,246 have co-existed with a limited exemption administered by OFCCP to allow nonprofit religious organizations that contract with the federal government to prefer members of a particular faith in employment decisions.

5.      The Trump Administration's Final Rule departs from that longstanding policy by adopting new definitions that greatly expand the religious exemption both in terms of who may claim the exemption and the kind of conduct it can be applied to.

6.      Approximately one-fifth of the entire U.S. workforce is employed by federal contractors.[2]  E.O. 11,246 has served an important role in combatting employment

---

[1] Off. of Fed. Cont. Compliance Programs, *About Us*, https://www.dol.gov/ofccp/aboutof.html (last visited Jan. 21, 2021).
[2] Off. of Fed. Cont. Compliance Programs, *History of Executive Order 11246*, https://www.dol.gov/agencies/ofccp/about/executive-order-11246-history (last visited Jan. 21, 2021).

discrimination, which not only promotes equal employment opportunity but also increases economic productivity by removing artificial barriers to placing the best workers for the job.

7.      The protections of E.O. 11,246 are particularly important for workers given that for-profit organizations are increasingly asserting religious identities, even if they lack official affiliation with a church, and religious groups are increasingly adopting commercial identities.

8.      By promulgating a watershed expansion of the religious exemption for federal contractors (and potential contractors), the Final Rule makes workers more vulnerable to discrimination, will lead to an increase in employment discrimination, and will injure Plaintiffs' sovereign, quasi-sovereign, economic, and proprietary interests.

9.      Plaintiffs the State of New York, State of California, State of Colorado, State of Connecticut, District of Columbia, State of Illinois, Commonwealth of Massachusetts, Dana Nessel on behalf of the People of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of North Carolina, Commonwealth of Pennsylvania, and State of Vermont bring this action to vacate the Final Rule and enjoin its implementation because it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), and because it exceeds and is contrary to Defendants' statutory jurisdiction, authority, and limitations in violation of the APA, 5 U.S.C. § 706(2)(C).

## JURISDICTION AND VENUE

10.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).  Jurisdiction is also proper under the judicial review provisions of the APA, 5 U.S.C. § 702.

11.      Declaratory and injunctive relief is sought consistent with 5 U.S.C. §§ 705 and 706, and as authorized in 28 U.S.C. §§ 2201 and 2202.

12.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities.  Plaintiff the State of New York is a resident of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred and are continuing to occur within the Southern District of New York.

**PARTIES**

13.     Plaintiff the State of New York, represented by and through its Attorney General, Letitia James, is a sovereign state of the United States of America.  The Attorney General is New York State's chief law enforcement officer and is authorized to pursue this action pursuant to N.Y. Executive Law § 63.

14.     Plaintiff the State of California, represented by and through its Attorney General, Xavier Becerra, is a sovereign state of the United States of America.  The Attorney General is the chief law officer of the State, Cal. Const., Art. V, § 13, and generally "has charge, as attorney, of all legal matters in which the State is interested . . . ."  Cal. Gov't Code § 12511.

15.     Plaintiff the State of Colorado, by and through Attorney General Philip J. Weiser, brings this action.  The Attorney General is the chief legal representative of the State of Colorado and is authorized to pursue this action on behalf of the State under Colo. Rev. Stat. § 24-31-101.

16.     Plaintiff State of Connecticut, represented by and through its Attorney General, William Tong, is a sovereign state of the United States of America.  The Attorney General brings this action as the state's chief civil legal officer under Conn. Gen. Stat. § 3-124 *et seq*.

17.     Plaintiff the District of Columbia (the "District") is a municipal corporation empowered to sue and be sued and is the local government for the territory constituting the permanent seat of the federal government.  The District brings this case through Karl A. Racine, the Attorney General for the District of Columbia, who is the chief legal officer for the District

and possesses all powers afforded the Attorney General by the common and statutory law of the District.  The Attorney General is responsible for upholding the public interest and has the authority to file civil actions in order to protect the public interest.  D.C. Code § 1-301.81.

18.     Plaintiff the State of Illinois, represented by and through its Attorney General, Kwame Raoul, is a sovereign state of the United States of America.  The Attorney General is the chief legal officer of the State, Ill. Const. 1970, art. V, § 15, and is authorized to pursue this action under 15 ILCS 205/4.

19.     Plaintiff Commonwealth of Massachusetts is a sovereign state of the United States of America.  This action is brought on behalf of the Commonwealth by Attorney General Maura Healey, who has both statutory and common-law authority and responsibility to represent the public interest for the people of Massachusetts in litigation, as well as to represent the Commonwealth, state agencies, and officials in litigation.  *Feeney v. Commonwealth*, 366 N.E.2d 1262, 1266-67 (Mass. 1977); Mass. Gen. Laws ch. 12, § 3.

20.     Plaintiff Attorney General Dana Nessel is Michigan's chief law enforcement officer and is authorized to pursue this action by Mich. Const. art. V, § 3 and Mich. Comp. Laws § 14.28.

21.     Plaintiff the State of Minnesota, represented by and through its Attorney General, is a sovereign state of the United States of America.  Attorney General Keith Ellison is the chief legal officer of the State of Minnesota and his powers and duties include filing lawsuits in federal court on behalf of the State of Minnesota.  Minn. Stat. § 8.01.

22.     Plaintiff State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America.  The Attorney General is the chief

law enforcement of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

23.     Plaintiff State of New Jersey is a sovereign state of the United States of America. This action is being brought on behalf of the State by Attorney General Gurbir S. Grewal, the State's chief legal officer. *See* N.J. Stat. Ann. § 52:17A-4(e), (g).

24.     Plaintiff State of New Mexico, represented by and through its Attorney General, Hector Balderas, is a sovereign state of the United States of America.  The Attorney General is the head of New Mexico's Department of Justice, N.M. Stat. Ann, § 8-5-1 and is authorized to prosecute and defend on behalf of the state when, in his judgment, the interest of the state requires such action. *Id.* at § 8-5-2.

25.     Plaintiff the State of North Carolina, represented by and through Attorney General Joshua H. Stein, is a sovereign state of the United States of America.  The Attorney General is the State of North Carolina's chief law enforcement officer and brings this challenge pursuant to his independent constitutional, statutory, and common-law authority.

26.     Plaintiff the Commonwealth of Pennsylvania is a sovereign state of the United States of America.  This action is brought on behalf of the Commonwealth by Attorney General Josh Shapiro, the "chief law officer of the Commonwealth."  Pa. Const. art. IV, § 4.1.

27.     Plaintiff the State of Vermont, represented by and through its Attorney General, Thomas J. Donovan, Jr., is a sovereign state of the United States of America.  The Attorney General is Vermont's chief law enforcement officer and is authorized to pursue this action pursuant to Vt. Stat. Ann. tit. 3, §§ 152 and 157.

28.     Plaintiffs are aggrieved by Defendants' actions and have standing to bring this action because the Final Rule harms their sovereign, quasi-sovereign, economic, and proprietary interests and will continue to cause injury unless and until the Final Rule is vacated.

29.     Defendant United States Department of Labor ("DOL" or the "Department") is a cabinet agency within the executive branch of the United States government and is an agency within the meaning of 5 U.S.C. § 552(f).  DOL promulgated the Final Rule and is responsible for its enforcement.

30.     Defendant Al Stewart is the Acting Secretary of Labor and is sued in his official capacity.

## ALLEGATIONS

### I.     Statutory, Executive Order, and Regulatory Background

31.     For nearly eighty years, the federal government has put forth policies that aim to eradicate employment discrimination by federal contractors.  These efforts began in 1941 when President Franklin D. Roosevelt signed Executive Order 8802 to outlaw discrimination based on race, color, creed, and national origin in the federal government and defense industries.[3]

32.     Since 1964, Title VII of the Civil Rights Act has prohibited discrimination in employment on the basis of race, color, religion, sex, or national origin.  *See* Pub. L. No. 88–352, 78 Stat. 241.  In enacting Title VII, Congress specifically considered and rejected proposals that provided religious employers a complete exemption from regulation under the Act, *see Equal Employment Opportunity Commission v. Pacific Press Publishing Association*, 676 F.2d 1272, 1276-77 (9th Cir. 1982) (discussing legislative history), *abrogated on other grounds as recognized by Alcazar v. Corp. of Catholic Archbishop of Seattle*, 598 F.3d 668, 675 (9th Cir.

---

[3] *See History of Executive Order 11246*, *supra* n.2.

2010), and instead carved out a narrow accommodation for religious employers to take religion into account for employees performing religious activities, Pub. L. No. 88–352, § 702, 78 Stat. 241, 255 (codified as amended at 42 U.S.C. 2000e–1(a)).

33.     A year later, President Johnson signed E.O. 11,246, which required federal contractors to agree that "[t]he contractor will not discriminate against any employee or applicant for employment because of race, creed, color, or national origin." 30 Fed Reg. 12,319, 12,320 (Sept. 24, 1965), § 202. President Johnson expanded the Order in 1967 to "expressly embrace" Title VII's policy of equal employment opportunity without discrimination on the bases of race, color, religion, sex, or national origin. *Amending Executive Order No 11246, Relating to Equal Employment Opportunity*, 32 Fed. Reg. 14,303, 14,303 (Oct. 17, 1967).

34.     In 1972, Congress amended the Title VII exemption for religious employers to its current form: "This title [VII] shall not apply . . . to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities." Equal Employment Opportunity Act of 1972, Pub. L. No. 92–261 § 3, 86 Stat. 103, 104 (codified at 42 U.S.C. § 2000e–1(a)). Congress defined "religion" to "include[] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* at § 2(7), 86 Stat. at 103 (codified at 42 U.S.C. 2000e(j)).

35.     In 1978, President Jimmy Carter consolidated E.O. 11,246 enforcement responsibilities in DOL.  *Consolidation of Contract Compliance Functions for Equal Employment Opportunity*, 43 Fed. Reg. 46,501, 46, 501 (Oct. 5, 1978).

36.     In 2002, President George W. Bush expressly imported Title VII's exemption for religious organizations.  *Equal Protection of the Laws for Faith-Based and Community Organizations*, 67 Fed. Reg. 77,141, 77,143 (Dec. 16, 2002).  This exemption was codified at 41 C.F.R. § 60–1.5(a)(5).

37.     In 2014, President Barack Obama amended the Order to expressly prohibit discrimination on the basis of sexual orientation or gender identity.  *Further Amendments to Executive Order 11478, Equal Employment Opportunity in the Federal Government, and Executive Order 11246, Equal Employment Opportunity*, Exec. Order No. 13,672, 79 Fed. Reg. 42,971, 42,971 (July 23, 2014), § 2(a) (amending § 202 of Exec. Order 11,246).

38.     Accordingly, Section 202(1) of E.O. 11,246 states, "The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, sexual orientation, gender identity, or national origin."

39.     Section 204(3) states, "Section 202 of this Order shall not apply to a Government contractor or subcontractor that is a religious corporation, association, educational institution, or society, with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.  Such contractors and subcontractors are not exempted or excused from complying with the other requirements contained in this Order."

40.     With virtually identical text, the Order's religious exemption today is coextensive with Title VII.  Substantially similar language is "of course, a strong indication that the two

[exemption provisions] should be interpreted pari passu," i.e., with worker protections that are co-extensive with one another. *Northcross v. Bd. of Educ.*, 412 U.S. 427, 428 (1973) (per curiam); *see also* 85 Fed. Reg. at 79,324.

## II. The "Implementing Legal Requirements Regarding the Equal Opportunity Clause's Religious Exemption" Rule.

### A. The 2019 Proposed Rule.

41. On August 15, 2019, the Department published in the Federal Register a Notice of Proposed Rulemaking "to clarify the scope and application of the religious exemption contained in section 204(c) of Executive Order 11246, as amended." *Implementing Legal Requirements Regarding the Equal Opportunity Clause's Religious Exemption*, 84 Fed. Reg. 41,677, 41,677 (Aug. 15, 2019) (the "Proposed Rule"). DOL provided only 30 days for the public to submit comments. *Id.* at 41,678.

42. In a radical departure from the limited religious organization exemption under section 204(c) of the Order, DOL proposed to broaden the exemption to allow for-profit entities to claim the exemption, *see id.* at 41,684, and to allow contractors and potential contractors to condition employment on adherence to religious tenets rather than simply to exercise a preference for members of the same faith, i.e., coreligionists, *see id.* at 41,690–91 (proposed definition of "particular religion"); *see also id.* at 41,679. It did so by proposing to codify broad definitions of the terms "exercise of religion," "particular religion," "religion," "religious corporation, association, educational institution, or society," and "sincere." *Id.* at 41,679. DOL further proposed that the exemption should be read as broadly as possible.

43. DOL invoked recent Supreme Court precedent in support of the Proposed Rule, acknowledging that "[a]lthough these decisions are not specific to the federal government's

regulation of contractors, they have reminded the federal government of its duty to protect religious exercise—and not to impede it."  *Id.* at 41,679.

44.     DOL received more than 109,000 comments in response to the Proposed Rule from individuals and from a wide variety of organizations, including religious organizations, universities, civil rights and advocacy organizations, contractor associations, legal organizations, labor organizations, members of Congress, as well as many of the Plaintiff States.  85 Fed. Reg. at 79,324.  Many commenters raised concerns that DOL ignored the constraints of Title VII and controlling Supreme Court authority and had failed to take into consideration the Proposed Rule's economic and non-economic costs to employees, including, but not limited to, lost wages and benefits as well as negative mental and physical health consequences of discrimination.  *Id.* at 79,325 (contrary to Title VII); 79,327 (inconsistent with Supreme Court precedent); 79,368 (costs).

**B.     The Final Rule.**

45.     Under the direction of then-Secretary Eugene Scalia, DOL published the Final Rule on December 9, 2020, with an effective date of January 8, 2021.  85 Fed. Reg. at 79,324. With few modifications to the Proposed Rule, DOL adopted a Final Rule that permits both a wider range of entities to claim the religious exemption and in a wider range of circumstances than ever previously allowed.

46.     DOL finalized the definitions of "religion" and "sincere" without change.  *Id.* at 79,330, 79,343.  It also adopted a near identical definition of "particular religion"; the only change was to add the word "sincere."  *Id.* at 79,343.

47.     With respect to whether an entity qualifies as a "religious corporation, association, educational institution, or society," DOL promulgated a test that it states "can be viewed as following Judge O'Scannlain's concurrence [in *Spencer v. World Vision, Inc.*, 633

11

F.3d 723 (9th Cir. 2011)] with one addition." *Id.* at 79,332.  Breaking with both Judge

O'Scannlain and binding precedent, the addition allows a contractor that does not operate on a

not-for-profit basis (i.e., a for-profit entity) to claim the exemption if it "[p]resents other strong

evidence that its purpose is substantially religious." *Id.* at 79,371 (to be codified at 41 C.F.R.

§ 60–1.3).

48.     The Final Rule retains two proposed "non-determinative features" from the

Proposed Rule in the definition of "[r]eligious corporation, association, educational institution, or

society." *Id.* at 79,341.  Those are the statements that the organization "may or may not" "have a

mosque, church, synagogue, temple, or other house of worship" or "be supported by, be

affiliated with, identify with, or be composed of individuals sharing, any single religion, sect,

denomination, or other religious tradition." *Id.* at 79,341, 79,371.

49.     The Final Rule also adds examples within the definition of "religious corporation,

association, educational institution, or society" to illustrate which organizations qualify for the

exemption.  *Id.* at 79,371–72.

50.     The Final Rule does not adopt the proposed "exercise of religion" definition

because it was "no longer needed" after revising the second prong of the definition of "religious

corporation, association, educational institution, or society." *Id.* at 79,336 n.11.

51.     DOL claims that it has "adapted Title VII principles to ensure a proper fit in the

government's contracting context" and admits that there may be instances "where a contractor

would be entitled to the E.O. 11246 exemption but not the Title VII exemption." *Id.* at 79,326.

52.     DOL adopted the proposed "broad interpretation" provision and added a

severability provision. *Id.* at 79,372 (to be codified at 41 C.F.R. § 60–1.5(e)-(f)).

**III.     The Final Rule Is Unlawful Under the Administrative Procedure Act.**

    **A.     The Final Rule's New Definitions Violate Title VII and Executive Order 11,246.**

53.     As discussed above, the Final Rule promulgates new definitions for "religion," "particular religion," "sincere," and "religious corporation, association, educational institution, or society."  Each definition either exceeds the agency's authority, lacks a basis in statute or precedent, or directly contravenes Title VII's and E.O. 11,246's text and purpose.

54.     As noted, Title VII defines "religion" to "include[] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).

55.     Despite Congress's codification of this definition in longstanding federal law, the Final Rule rejects and rewrites Title VII by eliminating the final clause of the term's statutory definition.  Instead, the Final Rule defines religion broadly as "includ[ing] all aspects of religious observance and practice, as well as belief."  85 Fed. Reg. at 79,371 (to be codified at 41 C.F.R. § 60–1.3).  But DOL cannot override Congress.

56.     In turn, DOL's displacement of the statutory definition of "religion" taints its new definition for "particular religion."  *Id.* at 79,343.  As the agency itself explains, its new "particular religion" definition "flows directly from the broad definition of [r]eligion" that the agency has impermissibly adopted in contravention of Title VII and E.O. 11,246.  As Title VII dictates a narrower definition of "religion," so too does it require a narrower definition of "particular religion."

57.     Instead, the Final Rule defines "particular religion" as "the religion of a particular individual, corporation, association, educational institution, society, school, college, university, or institution of learning, including acceptance of or adherence to sincere religious tenets as understood by the employer as a condition of employment, whether or not the particular religion of an individual employee or applicant is the same as the particular religion of his or her employer or prospective employer." *Id.* at 79,371 (to be codified at 41 C.F.R. § 60–1.3). This definition radically expands the scope of the Order's religious exemption in two significant ways.

58.     First, as the agency explains, this definition "allows religious contractors not only to prefer in employment individuals who share their religion,"—known as co-religionists—"but also to condition employment on acceptance of or adherence to religious tenets as understood by the employing contractor." *Id.* at 79,344. In other words, under DOL's definition, a Muslim employer may not only act on a hiring preference for Muslims, but can discriminate against Muslim employees who exercise their religious beliefs in ways that differ from the employer's particular interpretation of the tenets of Islam.

59.     By expanding "particular religion" beyond co-religionists, the agency contravenes the text and purpose of Title VII and E.O. 11,246. As borne out by Title VII's legislative history, the plain meaning of "particular religion" in the statute and Order does not permit transforming a permissible preference for co-religionists into a right to discriminate against co-religionists' conduct—and certainly not against conduct otherwise protected from discrimination by Title VII, such as same-sex relations. *See Pac. Press Publ'g Ass'n*, 676 F.2d at 1276 ("During the enactment of the Civil Rights Act of 1964 and in later amendments, Congress specifically considered the scope of Title VII protection within religious institutions and rejected

proposals that provided religious employers a complete exemption from regulation under the Act. Title VII provides only a limited exemption enabling [employers] to discriminate in favor of co-religionists.").

60.     Second, the agency's expansive definition of "particular religion" goes further. The definition permits discriminating against conduct "whether or not the particular religion of an individual employee or applicant is the same as the particular religion of his or her employer or prospective employer"—i.e., an employer may discriminate against conduct even if the employee *is of a different religion*. 85 Fed. Reg. at 79,371. Instead of the religious exemption operating to allow employers to favor potential employees who share the employer's faith, the exemption now does the opposite: it operates to permit an employer to impose its religious tenets on employees of different faiths. This does not accord with Title VII and E.O. 11,246.

61.     For the purposes of understanding the inverted definition of "particular religion," the Final Rule further defines "sincere." Under the Rule, "sincere" means "sincere under the law applied by the courts of the United States when ascertaining the sincerity of a party's religious exercise or belief." *Id.* at 79,372 (to be codified at 41 C.F.R. § 60–1.3). The circular formulation of "sincere" promises to confuse, rather than clarify, how federal contractors' religious claims will be evaluated, increasing the risk that entities abuse the capacious new definition of "particular religion." Indeed, under the Rule, an employer does not even need to impose its religious tenets in a "uniform[]" manner to be considered sincere. *Id.* at 79,357.

62.     In fact, the agency concedes that it adopted the Final Rule to permit more discrimination. Explaining the impetus for the Rule, DOL asserts that it "has less than a compelling interest in enforcing Executive Order 11,246 when a religious organization takes

employment action solely on the bases of sincerely held religious tenets that also implicate a protected classification, other than race." *Id*. at 79,354.

63.     Consistent with its stated motivation, DOL's definition of "religious corporation, association, educational institution, or society" unlawfully expands the religious exemption in a confusing way that flips Congress's very purpose in adopting the Title VII religious exemption that E.O. 11,246 incorporates.

64.     The Final Rule first adds additional types of educational entities to the list of those that may qualify for the exemption.  It then disavows any requirement that the religious organization be affiliated with a house of worship or even a religious tradition at all, thereby, once again, rewriting Title VII and E.O. 11,246. *See id.* at 79,371 (to be codified at 41 C.F.R. § 60–1.3) ("Religious corporation, association, educational institution, or society means a corporation, association, educational institution, society, school, college, university, or institution of learning"); *id.* ("To qualify as religious a corporation, association, educational institution, society, school, college, university, or institution of learning may, or may not: Have a mosque, church, synagogue, temple, or other house of worship; or be supported by, be affiliated with, identify with, or be composed of individuals sharing, any single religion, sect, denomination, or other religious tradition.").

65.     The Final Rule next adopts a four-factor test to determine what may be considered a "religious corporation, association, educational institution, or society."  Specifically, a qualifying entity (i) "Is organized for a religious purpose"; (ii) "Holds itself out to the public as carrying out a religious purpose"; (iii) "Engages in activity consistent with, and in furtherance of, that religious purpose"; and (iv) either (A) "Operates on a not-for-profit basis"; or (B) "Presents other strong evidence that its purpose is substantially religious." *Id.*  For each, the Rule sets

artificially low—or vulnerably vague—thresholds for demonstrating the relevant nexus to religious purpose.  *Id.* at 79,331–41.

66.     The Rule's factor permitting a for-profit entity to qualify for the exemption provided that it presents "strong evidence" is a particularly egregious rewriting of the scope and purpose of the religious exemption.  *Id*. at 79,332 (internal quotation marks omitted).

67.     In codifying a brand-new exemption for for-profit entities, DOL ignores significant precedent and violates Title VII and E.O. 11,246.  The Supreme Court has indicated that Title VII's exemption does not extend to for-profit corporations.  *Burwell v. Hobby Lobby Stores, Inc*., 573 U.S. 682, 716–17 (2014).  Even the Judge O'Scannlain concurrence on which the agency purports to rely to create its novel four-factor test does not go so far as to provide for-profit entities a means to qualify for the religious exemption.  *See World Vision, Inc*., 633 F.3d at 734 (O'Scannlain, J., concurring).

68.     After upending the text and purpose of Title VII and the Order despite no authority to do so, the Final Rule adopts a rule of construction for these definitions to "provide[] for the broadest protection of religious exercise permitted by the Constitution and laws, including RFRA."  85 Fed. Reg. at 79,359.  In doing so, the Rule transforms the religious exemption from one of narrow accommodation for non-profit religious entities to be able to hire co-religionists in the context of an anti-discrimination law of general applicability into a loophole that allows employers to discriminate against employees of any religion.

69.     Despite, as discussed above, attempting to explain this seismic shift away from the text and purpose of Title VII and E.O. 11,246 and disguise is it as an interpretation consistent with existing precedents, the Final Rule also simultaneously concedes that its newfound interpretations create disparities in the law.  The Rule acknowledges that it breaks with Title VII,

*id.* at 79,326, (acknowledging that there will be circumstances "where a contractor would be entitled to the E.O. 11246 exemption but not the Title VII exemption"), and does so with the purported goal of creating "a broader pool of organizations to compete for government contracts, which will inure to the government's benefit," *id.* at 79,330.

70.     The agency attempts to create a sheen of authority for overriding Congress and the Order by offering faulty interpretations of Supreme Court precedent.  But by the agency's own admission, "with the exception of *Hosanna-Tabor* [*Evangelical Lutheran Church & School v. Equal Employment Opportunity Commission*, 565 U.S. 171 (2012), these cases] did not specifically address employment law, Title VII, or E.O. 11246."  *See* 85 Fed. Reg. at 79,327. And *Hosanna-Tabor* addressed a separate exception for ordained or commissioned ministers based on the Constitution, not any statute or executive order.  *See* 565 U.S. at 188.  At best, then, and as the agency admitted, "OFCCP noted the recent Supreme Court cases for the general and commonsense propositions that the government must be careful when its actions may infringe private persons' religious beliefs and that it certainly cannot target religious persons for disfavor."  85 Fed. Reg. at 79,327–28.

71.     "General and commonsense propositions" in Supreme Court cases—commonly known as dicta—do not a permit an agency to exercise undelegated authority, ignore federal law or precedent, or defy Congress's will.

72.     Even if the Supreme Court's "general and commonsense propositions" did allow the agency to skirt basic principles of administrative law, none of the cited Supreme Court decisions provide the impetus for the Final Rule that DOL claims they do.  85 Fed. Reg. at 79,325.  By and large, these cases simply affirm that neutral rules can be properly crafted to accommodate sincerely-held religious beliefs.  *See, e.g.*, *Masterpiece Cakeshop, Ltd. v. Colo.*

*C.R. Comm'n*, 138 S. Ct. 1719, 1732 (2018); *see also Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2260–61 (2020); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017).  If anything, they demonstrate that E.O. 11,246's religious exemption should not be expanded, as DOL has done here, to open the door for employers to infringe on the rights of their employees.

> **B.    The Final Rule Fails to Justify Its Departure from Settled Interpretations of E.O. 11,246 and Is Inadequately Explained.**

73.    As noted, the protections of E.O. 11,246 have co-existed with the limited exemption for non-profit religious organizations to prefer co-religionists since 2002.  As the Final Rule states, "[t]he religious exemption was added to E.O. 11246 almost twenty years ago, and OFCCP's implementing regulations are nearly as old."  85 Fed. Reg. at 79,326.  The agency's attempts to justify its change in position from nearly two decades of precedent fail.

74.    In addition to the conflicts with Title VII and the Order discussed above, DOL departs from its own past practices in expanding the exemption.  OFCCP has previously instructed that the exemption is meant simply to allow religious organizations to give employment preference to co-religionists.  *See, e.g.*, OFCCP, Compliance Webinar (Mar. 25, 2015), https://www.dol.gov/ofccp/LGBT/FTS_TranscriptEO13672_PublicWebinar_ES_QA_508c.pdf ("This exemption allows religious organizations to hire only members of their own faith.").

75.    DOL "disputes" that it is modifying the religious exemption "for the purpose of qualifying more organizations for the exemption."  *Id.* at 79,332–33.  And it repeatedly stresses that the Final Rule "will have no effect on the vast majority of contractors or the agency's regulation of them, since they do not and would not claim the religious exemption."  *Id.* at 79,329; *see also id.* at 79,326; 79,330; 79,339; 79,365; 79,367.  But at the same time, DOL

repeatedly asserts that the Final Rule will "expand the pool of federal contractors."  *Id.* at 79,369;
*see also id.* at 79,333 ("final rule is intended to increase the pool of federal contractors");
79,340–41 ("Indeed, among the rule's intended purposes is expanding the pool of contractors");
79,365 (rule "may encourage a broader pool of organizations to compete for government
contracts").

76.      Indeed, DOL attempts to justify the expanded religious exemption by asserting
that it "may encourage a broader pool of organizations to compete for government contracts,
which will inure to the government's benefit."  *Id.* at 79,330.  But the Department makes no
effort to determine the impact its new test will have, admitting that it "cannot perfectly ascertain
how many religious organizations are government contractors, or would like to become such,
and how those numbers would compare to the whole of the contracting pool."  *Id.* at 79,239.
Plus, DOL has not identified any organizations that previously would not have applied for a
federal contract but now will in light of the Final Rule.

77.      DOL also presents no evidence that religious organizations had been avoiding
applying for federal contracts prior to promulgation of the Rule.  And DOL fails to adequately
support its weaker assertion that religious organizations "have been reluctant to participate as
federal contractors[.]"  85 Fed. Reg. at 79,370.  The entirety of DOL's "evidence" is an
unidentified individual commenter who described religious organizations' reluctance to contract
with the federal government secondhand and two other unidentified commenters who discussed
"religious organizations' reluctance to participate in *other contexts*, such as federal grants," not
federal contracting.  *Id.* (emphasis added).

78.      Acknowledging that the Rule may not actually lead to any new religious
organizations applying, DOL claims that "clarifying the law for current contractors is a valuable

goal in itself." *Id.* at 79,329.  But the Final Rule will only confuse, not clarify, given its departure from Title VII precedent and past agency practice.

79.     Additionally, the Final Rule contains undefined phrases for determining whether the exemption applies, which also belies the clarity rationale.  For example, with respect to the second prong of its new four-factor test, the Final Rule uses the vague phrases "material amount of religious activity," *id.* at 79,336, and "reasonably clear," *id.* at 79,337.  DOL also acknowledges that aspects of applying the religious exemption are "necessarily and rightly nuanced and fact-dependent," further undermining the rule's purported clarity.  *Id.* at 79,358.

80.     The Rule also fails to account for the reliance interests of employees currently working for organizations that will newly claim the exemption.  These employees rely on the protections of E.O. 11,246 to shield them from adverse employment decisions, which under the Rule could now be taken if the employee does not adhere to the employer's professed tenets.

**C.     The Department Failed to Adequately Consider or Quantify the Final Rule's Widespread Harms.**

81.     The Final Rule's Regulatory Impact Analysis simply declines to quantify or assess many of the harms that will arise from the Final Rule.

82.     In response to the Proposed Rule, commenters, including many of the Plaintiffs here, raised concerns that DOL's proposed expansion of the E.O. 11,246 religious exemption test would weaken anti-discrimination protections for a substantial percentage of private-sector workers nationwide who are employed by a federal contractor, including LGBT people, women, and other minority groups.  Commenters emphasized that increased employment discrimination, in turn, would result in significant harms for these employees, including in lost wages and benefits, out of pocket medical expenses, job search costs, and negative mental and physical health consequences.  85 Fed. Reg. at 79,368.

21

83.     Commenters also described the effects that such employment discrimination would have on the economy, tax revenue, health care, and public benefit use.  Many of the Plaintiffs here explained how those costs would be shouldered by state and local governments.

84.     Indeed, the Department recognized "that there may be some existing costs that may shift from the federal government to state or local governments," *id.* at 79,371, but then failed to identify them or engage in a federalism analysis.

85.     Despite these comments and its own acknowledgement, DOL declined in its Regulatory Impact Analysis to consider or quantify any of the costs associated with employment discrimination and its effects for workers, taxpayers, governments, or other stakeholders because it purportedly lacked "additional information or data."  *Id.* at 79,368–69.

86.     Yet, in assessing the benefits of the Rule, the Department acknowledged that "some rules have benefits that are difficult to quantify or monetize but are important," and considered such benefits in its Regulatory Impact Analysis.  *Id.* at 79,370.

87.     To consider the unquantifiable purported benefits of the Rule, while at the same time declining to consider its substantial costs to employees, taxpayers, state and local governments, and other entities is also arbitrary and capricious.

## IV.     The Final Rule Harms Plaintiffs.

88.     The Final Rule will harm Plaintiffs' sovereign, quasi-sovereign, economic, and proprietary interests.  Indeed, DOL concedes that "there may be some existing costs that may shift from the federal government to state or local governments."  85 Fed. Reg. at 79,371.

A.    **The Final Rule Will Harm the Health and Well-Being of Plaintiffs'**
      **Workforce.**

89.    The Final Rule will weaken anti-discrimination protections for workers employed

by a federal contractor, which include more than approximately twenty percent of private-sector

workers nationwide.[4]

90.    Indeed, during fiscal year 2020 alone, the total number of contracts performed in

Plaintiffs' respective jurisdictions was over 3 million, totaling over 224 billion dollars.[5]

91.    Despite gains that Title VII and similar state and local laws have made in

improving employment outcomes for racial and ethnic minorities, and in reducing sex-and

gender-based wage gaps and occupational segregation, discrimination persists in the American

workplace based on race, gender, sex, gender-identity, religion, and other protected categories.

92.    For example, a recent survey found that lesbian, gay, and bisexual people are

significantly more likely to report experiences of employment discrimination as opposed to their

heterosexual peers, with 60% reporting being fired from or denied a job and 48% being denied a

promotion or receiving a negative evaluation, compared to 40% and 32% respectively among

heterosexuals.[6]

---

[4] *See History of Executive Order 11246*, *supra* n.2; U.S. Dep't of Lab. Wage and Hour Div., *Paid Sick Leave* (Sept. 2016), https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/HowDoIKnow.pdf; The White House, Off. of the Press Sec'y, *FACT SHEET: Fair Pay and Safe Workplaces Executive Order* (July 31, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/07/31/fact-sheet-fair-pay-and-safe-workplaces-executive-order (stating that the "Department of Labor estimates that . . . businesses with federal contracts[ ] employ[ ] about 28 million workers"); Bureau of Lab. Stat., *Employment, Hours, and Earnings from the Current Employment Statistics Survey (National)* (extracted Jan. 7, 2021) (estimating 121,197,000 jobs).
[5] *See State Profiles*, USASpending.gov, https://www.usaspending.gov/state (calculated by filtering each state profile to FY2020 and adding "Count" of "Contracts" and "Amount" of "Contracts" respectively for all Plaintiffs).
[6] Ilan H. Meyer, *Experiences of Discrimination among Lesbian, Gay and Bisexual People in the US*, UCLA Sch. of L. Williams Inst., 1 (Apr. 2019), https://williamsinstitute.law.ucla.edu/publications/lgb-discrimination-experiences/.

93.     Further, according to a 2017 survey, "one in five LGBTQ people report[ed] being personally discriminated against because of their sexuality or gender identity when applying for jobs" and 22% said they had experienced such discrimination in pay or promotion.[7]  A 2016 nationally representative survey found "25.2 percent of LGBT respondents ha[d] experienced discrimination because of their sexual orientation or gender identity in the past year."[8]

94.     And according to a 2017 Pew Research Center survey, about four-in-ten working women in the United States report having faced workplace discrimination because of their gender.[9]

95.     At the same time, a variety of employers have sought exemptions from generally applicable laws on the basis of their religious beliefs.  *See, e.g.*, *Hobby Lobby*, 573 U.S. at 769-70 (Ginsburg, J., dissenting) (collecting cases).

96.     Moreover, religious groups are increasingly adopting commercial identities.[10]  For example, Catholic hospitals account for 14.5% of the United States healthcare market and receive government funds.[11]  Further blurring the boundaries, as a result of industry consolidation, a growing number of healthcare organizations—secular and religious, public and private, for-profit and nonprofit—are entering contractual commitments to abide by religious

---

[7] NPR et al., *Discrimination in America: Experiences and Views of LGBTQ Americans*, 29 (Nov. 2017), https://legacy.npr.org/documents/2017/nov/npr-discrimination-lgbtq-final.pdf .
[8] Sejal Singh & Laura E. Durso, *Widespread Discrimination Continues to Shape LGBT People's Lives in Both Subtle and Significant Ways*, Ctr. for Am. Progress (May 2, 2017, 8:10 AM), https://www.americanprogress.org/issues/lgbtq-rights/news/2017/05/02/429529/widespread-discrimination-continues-shape-lgbt-peoples-lives-subtle-significant-ways/.
[9] Pew Rsch. Ctr., *Gender Discrimination Comes in Many Forms for Today's Working Women* (Dec. 14, 2017), https://www.pewresearch.org/fact-tank/2017/12/14/gender-discrimination-comes-in-many-forms-for-todays-working-women/.
[10] Elizabeth Sepper, *Zombie Religious Institutions*, 112 Nw. L. Rev. 929, 987 (2018).
[11] *Id.* at 934-36.

identities that apply long after any actual attachment to a church or association of religious people has ceased.[12]  For-profit enterprises directly owned by faith-based groups also generate billions of dollars in annual revenues in industries as diverse as newspaper, radio, television, publishing and distribution, digital media, hospitality, insurance, and agriculture.[13]

97.     By expanding the religious organization exemption, and lessening OFCCP's oversight with respect to businesses and other entities claiming such an exemption, discrimination based on race, ethnicity, sex, gender, gender-identity, and other protected categories will likely increase, and harm the health and well-being of Plaintiffs' workers.[14]

98.     For example, after the Supreme Court recognized a constitutional "ministerial" exception to employment discrimination laws in *Hosanna-Tabor*, several Catholic dioceses have since designated all of their teachers as "ministers," thus jeopardizing such teachers' ability to challenge adverse employment decisions as violating antidiscrimination law.[15]

99.     Moreover, employers often cite their religious objections when attempting to justify discriminatory practices.  For example, according to a 2013 Pew Research Center survey:

> The religious basis for opposition to homosexuality is seen clearly in the reasons people give for saying it should be discouraged by society. By far the most frequently cited factors—mentioned by roughly half (52%) of those who say homosexuality should be discouraged—are moral objections to homosexuality, that it conflicts with religious beliefs, or that

---

[12] *Id.* at 940-41.

[13] Alan J. Meese et al., *Hobby Lobby, Corporate Law, and the Theory of the Firm: Why For-Profit Corporations are RFRA Persons*, 127 Harv. L. Rev. F. 273, 277-79 (collecting examples of for-profit corporations, publicly and closely held, asserting religious identities).

[14] *See, e.g.*, Deborah A. Widiss, *Intimate Liberties & Antidiscrimination Law*, 97 B.U. L. Rev. 2083, 2109 (2017) ("[R]ecent Supreme Court decisions expanding the scope of entities that may bring RFRA claims and the scope of the 'ministerial' exception dramatically increase the likelihood that religious organizations and for-profit businesses will seek exemptions from otherwise applicable non-discrimination laws."); *Hobby Lobby*, 573 U.S. at 770-71 (Ginsburg, J., dissenting) (warning of increased risks of discrimination because of the Court's broad interpretation of RFRA).

[15] *See* Widiss, *supra* n.14, at 2105.

it goes against the Bible. No more than about one-in-ten cite any other reasons as to why homosexuality should be discouraged by society.[16]

100.    Discrimination against women in employment also occurs under the pretext of religious beliefs.  Women have been fired or demoted for their decisions to access reproductive health care, such as contraception, abortion, and in-vitro fertilization, and for their decisions about whether and how to start a family, including becoming pregnant outside of marriage or becoming pregnant while in an LGBTQ relationship.[17]

101.    An increase in discrimination because of the Final Rule, in turn, will likely force job change and lead to worker displacement and new instances of unemployment for individuals who face discrimination.[18]

102.    Worker displacement because of the Final Rule will reduce opportunities for on-the-job learning and advancement, lead to the abandonment of well-paying careers, and reduce the lifetime earnings of Plaintiffs' residents.[19]

---

[16] Pew Rsch. Ctr., *In Gay Marriage Debate, Both Supporters and Opponents See Legal Recognition as "Inevitable"* (June 6, 2013), https://www.pewresearch.org/politics/2013/06/06/in-gay-marriage-debate-both-supporters-and-opponents-see-legal-recognition-as-inevitable/.

[17] *See, e.g.*, *Herx v. Diocese of Fort Wayne-S. Bend Inc.*, 48 F. Supp. 3d 1168, 1170 (N.D. Ind. 2014) (school "declined to renew . . . teaching contract after learning [teacher] was undergoing in vitro fertilization in an effort to become pregnant"); *Ganzy v. Allen Christian Sch.*, 995 F. Supp. 340, 345 (E.D.N.Y. 1998) (an unmarried teacher at a religious school was fired because, as the school explained, her pregnancy was "clear evidence that she had engaged in coitus while unmarried"); *Ducharme v. Crescent City Déjà vu, L.LC.*, 406 F.Supp.3d 548, 551(E.D. La. 2019) (woman fired at her job for having an abortion); *see also* Dana Liebelson & Molly Redden, *A Montana School Just Fired a Teacher for Getting Pregnant. That Actually Happens All the Time*, Mother Jones (Feb. 10, 2014), https://www.motherjones.com/politics/2014/02/catholic-religious-schools-fired-lady-teachers-being-pregnant/.

[18] *See, e.g.*, Elizabeth Wrigley-Field & Nathan Seltzer, *Unequally Insecure: Rising Black/White Disparities in Job Displacement, 1981-2017*, Washington Ctr. for Equitable Growth (Feb. 2020) (finding that "Black workers were nearly always more likely to be displaced than whites, but that the Black/white disparity has grown over time with excess Black displacement doubling for women and tripling for men since the 1990s"); Devah Pager & Hana Shepherd, *The Sociology of Discrimination: Racial Discrimination in Employment, Housing, Credit, and Consumer Markets*, 34 Ann. Rev. Socio. 181, 187 (2008).

[19] *See, e.g.*, Marta Lachowska, et al., *Sources of Displaced Workers' Long-Term Earnings Losses* 2 (Nat'l Bureau of Econ. Rsch., Working Paper No. 24127, 2019),
https://www.nber.org/system/files/working_papers/w24217/w24217.pdf; Elyse Shaw, et al., *Sexual Harassment and Assault at Work: Understanding the Costs* 4–5 (Inst. for Women's Pol'y Rsch., Briefing Paper No. B376, 2018),

103.    Moreover, an increase in employment discrimination caused by the Final Rule

will result in negative mental and physical health outcomes for Plaintiffs' residents.  Workers

who are discriminated against and face job uncertainty or unemployment are more likely to

experience depression, anxiety, and other mental health disorders, and are also at higher long-

term risk for physical health problems.[20]

### B.    The Final Rule Will Harm Employers in Plaintiffs' Jurisdictions.

104.    The Final Rule will also adversely affect businesses in Plaintiffs' jurisdictions.

Instead of simplifying the legal landscape, the Final Rule sows confusion among federal

contractors about their legal obligations.

105.    As discussed above and below, the legal standards for the religious exemption

under the Final Rule compared to Title VII and state and local jurisdictions conflict with one

another.  Accordingly, as a practical matter, the Final Rule will subject federal contractors to

different sets of competing legal requirements.  These divergent standards will likely result in

greater confusion, misunderstanding, and litigation.

106.    Moreover, the Final Rule's likely effect of increased employment discrimination

will have negative effects on businesses overall, including in lost revenue, recruitment, retention,

---

https://iwpr.org/publications/sexual-harassment-work-cost/.

[20] *See, e.g.*, Stephanie Pappas, *The Toll of Job Loss*, 51 Monitor on Psych. 54 (2020),
https://www.apa.org/monitor/2020/10/toll-job-loss; Jagdish Khubchandani, et al., *Workplace Harassment and Morbidity Among US Adults: Results from the National Health Interview Survey*, 40 J. Cmty. Health 555, 557-58 (2015); Kimberly Schneider, et al., *Job-Related Psychological Effects of Sexual Harassment in the Workplace: Empirical Evidence from Two Organizations*, 82 J. Applied Psych. 401, 412 (1997); Brad Sears, et al., *Documented Evidence of Employment Discrimination & Its Effects on LGBT People*, Williams Inst. (July 2011) https://williamsinstitute.law.ucla.edu/publications/employ-discrim-effect-lgbt-people/.

and employee productivity.[21]  For example, recent research on the cost of employee turnover

shows that such turnover costs an average of nearly 40 percent of the position's annual wage.[22]

### C.     The Final Rule Will Harm Plaintiffs' Economic Interests.

107.     The Final Rule will harm Plaintiffs' economic interests by reducing tax revenue

and increasing costs to Plaintiffs' health care and public benefit programs.

#### 1.   The Final Rule Will Cause Plaintiffs to Lose Tax Revenue.

108.     The Final Rule will likely lead to a loss of tax revenue for Plaintiffs.

109.     For example, Plaintiffs impose and collect taxes based on income.  *See* D.C. Code

§ 47-1801 *et seq.*; 35 ILCS 5/1 *et seq.*; Mass. Gen. Laws ch. 62; Mich. Comp. Laws § 206.1 *et*

*seq.*; Minn. Stat. ch. 290; N.J. Stat. Ann. § 54A:1-1 *et seq.*; N.M. Stat. § 7-2-3; N.Y. Tax Law

§ 612(a); Vt. Stat. Ann. tit. 32, §§ 5822-5823.

110.     Employment discrimination leads to a loss of state tax revenue from income.  For

instance, studies in 2011 and 2013 found that Massachusetts and New York, respectively, lost

millions of dollars in tax revenues due to employment discrimination against transgender

workers.[23]

---

[21] Crosby Burns, *The Costly Business of Discrimination: The Economic Costs of Discrimination and the Financial Benefits of Gay and Transgender Equality in the Workplace*, Ctr. for Am. Progress, 2 (March 2012), https://cdn.americanprogress.org/wp-content/uploads/issues/2012/03/pdf/lgbt_biz_discrimination.pdf.

[22] Kate Bahn & Carmen Sanchez Cumming, *Improving U.S. Labor Standards and the Quality of Jobs to Reduce the Costs of Employee Turnover to U.S. Companies*, Washington Ctr. for Equitable Growth (Dec. 21, 2020); *see also* Heather Boushey & Sarah Jane Glynn, *There Are Significant Business Costs to Replacing Employees*, Ctr. for Am. Progress (Nov. 16, 2012, 3:44 AM), https://www.americanprogress.org/issues/economy/reports/2012/11/16/44464/there-are-significant-business-costs-to-replacing-employees/ (describing over 30 studies that show that it costs businesses about one-fifth of a worker's salary to replace that worker).

[23] *See* Jody L. Herman, *The Cost of Employment and Housing Discrimination against Transgender Residents in Massachusetts*, Williams Inst., 1 (April 2011), https://escholarship.org/uc/item/76r1z02g; Jody L. Herman, *The Cost of Employment and Housing Discrimination against Transgender Residents in New York*, 1 (April 2013), https://escholarship.org/uc/item/7j08z94p.

111.    Because the Final Rule will likely cause an increase in employment

discrimination, job change, worker displacement, and new instances of unemployment, the Final

Rule will cause Plaintiffs to lose tax revenue.

**2.    The Final Rule Will Increase Costs to Plaintiffs' Health Care and Benefits Programs.**

112.    It is likely that any increase in employment discrimination caused by the Final

Rule will increase health care and public benefit program costs in Plaintiffs' jurisdictions.

113.    Specifically, many residents in Plaintiffs' jurisdictions obtain their health

insurance through Medicaid, the Children's Health Insurance Program, or other sources partially

funded by Plaintiffs.  Plaintiffs pay health care costs for eligible low-income and

moderate-income residents through a number of programs funded in whole or part by Plaintiffs.

To the extent that the Final Rule causes an increase in worker displacement and new instances of

unemployment, the number of individuals and families that rely on these programs will increase,

and Plaintiffs will need to expend more money to cover these costs.

114.    Additionally, because of the Final Rule, the health care costs that state and local

governments will bear will increase overall.  The Final Rule's effects of increased employment

discrimination will result in poorer health outcomes for workers and their families.  And because

individuals without health insurance wait longer to seek care, the care they eventually receive is

more expensive.

115.    Moreover, with new instances of unemployment because of the Final Rule, many

individuals and their families may be compelled to seek out other services or programs to

supplement or substitute their income, like Temporary Assistance for Needy Families ("TANF"),

state and local county funded Safety Net Assistance ("SNA") and General Assistance, and the

Supplemental Nutrition Assistance Program ("SNAP"), which will increase Plaintiffs' costs

associated with such programs.  Any increase in demands for these programs will further strain Plaintiffs' resources in light of the COVID-19 pandemic.  For example, in Massachusetts, total weekly applications for SNAP, the Transitional Aid to Families with Dependent Children program, and the Emergency Aid to the Elderly, Disabled and Children more than tripled over the month of March 2020 to nearly 22,000 applications per week.[24]

116.    Further, job loss is a common cause of homelessness.  The costs of increased homelessness to the Plaintiffs could be substantial, including with respect to the provision of transitional shelters and community supports, emergency services, and health care.  For example, the costs to Massachusetts associated with homelessness could range from $20,000 to $50,000 per person per year, based on an estimate provided by the U.S. Department of Housing and Urban Development.[25]

117.    Some Plaintiffs also provide or support job training and other services for individuals who are unemployed.  For example, the Division of Family and Community Services of the Illinois Department of Human Services provides services for unemployed individuals. Some of the providers that the Division of Family and Community Services relies on for providing work experience opportunities, job placements, or apprenticeships for Illinois workers are also federal contractors.  Accordingly, the Division of Family and Community Services has concerns that not only will employment discrimination due to the Final Rule create an increased need for its services, but also that their very providers may attempt to use the Final Rule to deny opportunities to Illinois workers, thereby undermining the Division's efforts.  And New Jersey's

---

[24] Chris Linsinski, *Mass. Residents Turning to Public Assistance Programs*, State House News Service (April 8, 2020, 3:48 PM), https://www.statehousenews.com/email/a/2020723?key=f1ceac.

[25] Brooke Spellman et al., *Costs Associated with First-Time Homelessness for Families and Individuals*, U.S. Dep't of Hous. & Urb. Dev., Off. of Pol'y Dev. & Rsch. (Mar. 2010), https://www.huduser.gov/portal/publications/povsoc/cost_homelessness.html.

Department of Labor and Workforce Development (NJLWD) provides occupational training and job placement services to unemployed individuals through one-stop centers throughout the state.

**D.    The Final Rule Will Increase Plaintiffs' Enforcement Costs and Regulatory Burdens.**

118.    Plaintiffs have enacted laws and policies that balance the protection of workers within their jurisdiction from discrimination on the basis of various protected classes with employers' religious beliefs.  Specifically:

    a.  The California Fair Employment and Housing Act ("CAFEHA") makes it unlawful for employers of five or more employees and state contractors to discriminate in employment on the basis of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex (including pregnancy), gender, gender identity, gender expression, age, sexual orientation, or veteran or military status.  Cal. Gov't Code §§ 12940(a), 12990.  The CAFEHA also requires employers of five or more employees and state contractors to reasonably accommodate the known disabilities and religious beliefs and practices of its employees.  Cal. Gov't Code §§ 12940(l) & (m), 12990.  The CAFEHA's anti-harassment protections cover employers of any size and state contractors.  Cal. Gov't Code §§ 12940(j), 12990.  California law provides an exemption to these requirements for nonprofit religious institutions.  The term "employer" is defined by the CAFEHA specifically to exclude any "religious

association or corporation not organized for private profit." Cal. Gov't Code § 12926(d).

b.  Colorado law provides that it is a discriminatory or unfair employment practice "[f]or an employer to refuse to hire, to discharge, to promote or demote, to harass during the course of employment, or to discriminate in matters of compensation, terms, conditions, or privileges of employment against any person otherwise qualified because of disability, race, creed, color, sex, sexual orientation, religion, age, national origin, or ancestry," and prohibits employers from using an application for employment or to make an inquiry in connection with prospective employment that expresses any limitation or discrimination on those protected bases. Colo. Rev. Stat. § 24-34-402(1)(a), (d).  The law exempts religious corporations, associations, educational institutions, and societies "with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such" organization "of its activities." *Id*. § 24-34-402(6).  The term "employer" under Colorado law does not include religious organizations and associations except if such organization or association "is supported in whole or in part by money raised by taxation or public borrowing." *Id.* § 24-34-402(7).

c.  Connecticut's law makes it illegal for employers and their agents "except in the case of a bona fide occupational qualification or need, to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms,

conditions or privileges of employment because of the individual's race, color, religious creed, age, sex, gender identity or expression, marital status, national origin, ancestry, present or past history of mental disability, intellectual disability, learning disability, physical disability, including, but not limited to, blindness or status as a veteran." Conn. Gen. Stat. § 46a-60(b)(1). Those prohibitions against employment discrimination include prohibitions against discrimination on the basis of sexual orientation and pregnancy status. *Id.* § 46a-60(b)(7); *id.* § 46a-81c. Connecticut's religious exemption carveout only applies in the case of a "bona fide occupational qualification or need," *id.* § 46a-60(b)(1), with an additional narrow carveout to the general rule against nondiscrimination on the basis of sexual orientation for "a religious corporation, entity, association, educational institution or society with respect to the employment of individuals to perform work connected with the carrying on by such corporation, entity, association, educational institution or society of its activities, or with respect to matters of discipline, faith, internal organization or ecclesiastical rule, custom or law which are established by such corporation, entity, association, educational institution or society." *Id.* § 46a-81p.

d. The District of Columbia Human Rights Act of 1977 ("DCHRA") prohibits discrimination in the areas of employment, housing, public accommodations, and educational institutions based on 21 protected traits: race, color, religion, national origin, sex, age, marital status,

personal appearance, sexual orientation, gender identity or expression, family responsibilities, political affiliation, disability, and other traits applicable in certain circumstances.  D.C. Code §§ 2-1401 *et seq*.  D.C. law contains a religious exemption to the DCHRA, in that the law states that it should not be construed to "bar any religious or political organization . . . from limiting employment, or admission to or giving preference to persons of the same religion or political persuasion as is calculated by the organization to promote the religious or political principles for which it is established or maintained."  D.C. Code §§ 2-1401.03(b).

e.  The Illinois Human Rights Act ("IHRA") prohibits discrimination in Illinois in a wide range of areas, including but not limited to employment, on the basis of race, color, religion, sex, national origin, ancestry, age, sexual orientation, gender-related identity, pregnancy, physical and mental disability, and other protected categories.  The Act also prohibits harassment on any unlawful basis, including sexual harassment.  *See* 775 ILCS 5/1, *et seq*.  In the context of discrimination in employment, the IHRA contains an exemption from the definition of an "employer" for religious institutions with respect to the employment of individuals of a particular religion so that those institutions can perform work connected with their religious activities.  *See* 775 ILCS 5/2-101(B)(2).

f.  Massachusetts's Fair Employment Practices Law ("MAFEPL") makes it unlawful to discriminate in the terms, conditions or privileges of

employment because of an individual's protected class status, including

race, color, religious creed, national origin, sex, sexual orientation, age,

ancestry, and disability, unless based upon a bona fide occupational

qualification.  Mass. Gen. Laws ch. 151B, § 4.  The MAFEPL makes it

an unlawful discriminatory practice for any employer or employment

agency to print or circulate or cause to be printed or circulated any

statement, advertisement or publication, or to use any form of application

for employment or to make any inquiry or record in connection with

employment, which expresses, directly or indirectly, any limitation,

specification or discrimination as to the race, color, religious creed,

national origin, sex, gender identity, sexual orientation, age, genetic

information, pregnancy, ancestry or status as a veteran, or disability.

Mass. Gen. Laws ch. 151B, §4(3).  The MAFEPL contains an exemption,

which permits a religious or denominational institution or organization,

or any organization operated for charitable or educational purposes,

which is operated, supervised or controlled by or in connection with a

religious organization, to limit admission to or give preference to persons

of the same religion or denomination or take any action with respect to

matters of employment, discipline, faith, internal organization, or

ecclesiastical rule, custom, or law which are calculated by such

organization to promote the religious principles for which it is established or maintained.  Mass. Gen. Laws ch. 151(B), § 4(18).[26]

g.  Michigan prohibits employment discrimination because of religion, race, color, national origin, age, sex, height, weight, or marital status, Mich. Comp. Laws § 37.2202, and alleged discrimination based on disabilities, *id.* § 37.1202.  A person may apply for an exemption to these prohibitions "on the basis that religion, national origin, age, height, weight, or sex is a bona fide occupational qualification reasonably necessary to the normal operation of the business or enterprise," and "upon sufficient showing," an exemption may be granted.  *Id.* § 37.2208.  Furthermore, "[a]n employer may have a bona fide occupational qualification on the basis of religion, national origin, sex, age, or marital status, height and weight without obtaining prior exemption from the commission, provided that an employer who does not obtain an exemption shall have the burden of establishing that the qualification is reasonably necessary to the normal operation of the business."  *Id.*

h.  The Minnesota Human Rights Act, Minn. Stat. ch. 363A ("MHRA") protects workers from unlawful discrimination.  Except when based on a bona fide occupational qualification, it is an unfair employment practice for an employer to discriminate in employment because of race, color, creed, religion, national origin, sex, marital status, status with regard to

---

[26] In *Barrett v. Fontbonne Academy*, No. 2014-cv-751, 2015 WL 9682042, at *4 (Mass. Super. Ct. Dec. 16, 2015), the court held that this exemption is only available to religious employers who explicitly limit admission or employment to members of their religion.

public assistance, familial status, membership or activity in a local

commission, disability, sexual orientation (which is defined to include

gender identity), or age.  Minn. Stat. §§  363A.08, subd. 2, 363A.03,

subd. 44 (defining sexual orientation).  Minnesota law provides an

exemption to these requirements: the employment discrimination

provisions do not apply "to a religious or fraternal corporation,

association, or society, with respect to qualifications based on religion or

sexual orientation, when religion or sexual orientation shall be a bona

fide occupational qualification for employment."  Minn. Stat. § 363A.20,

subd. 2.  In addition, the MHRA does not prohibit any religious

association, religious corporation, or religious society that is not

organized for private profit, or any educational institution operated by

such organizations, from limiting admission to or giving preference to

persons of the same religion or denomination.  Minn. Stat. § 363A.26(1).

i.   Nevada law prohibits discrimination in employment based on "race,

color, religion, sex, sexual orientation, gender identity or expression, age,

disability or national origin."  Nev. Rev. Stat. § 613.330(1).  Nevada has

a carveout similar to Title VII at Nev. Rev. Stat. § 613.320(1)(b).

Additionally, Nevada has further permitted a carveout "where religion,

sex, sexual orientation, gender identity or expression, age, physical,

mental or visual condition or national origin is a bona fide occupational

qualification reasonably necessary to the normal operation of that

particular business or enterprise," and also has a specific carveout for

educational institutions that are "in whole or in substantial part, owned, supported, controlled or managed by a particular religion or by a particular religious corporation, association or society, or if the curriculum of the school or institution is directed toward the propagation of a particular religion." Nev. Rev. Stat. § 613.350(1) and (4).

j.   The New Jersey Law Against Discrimination ("NJLAD") generally prohibits discrimination and harassment in employment based on "race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic information, pregnancy or breastfeeding, sex, gender identity or expression, disability or atypical hereditary cellular or blood trait, liability for service in the Armed Forces of the United States, nationality, and refusal to submit to a genetic test or make available the results of a genetic test to an employer." N.J. Stat. Ann. § 10:5-12(a). But religious associations and organizations may "utilize religious affiliation as a uniform qualification in the employment of clergy, religious teachers or other employees engaged in the religious activities of the association or organization" and may follow "the tenets of its religion in establishing and utilizing criteria for employment of an employee." *Id.* By its terms, the exception applies only to religious associations and organizations, not other employers who may seek religious exemptions to anti-discrimination laws. The New Jersey Division on Civil Rights ("NJDCR") reads these exemptions in tandem to mean that (i) religious

associations and organizations may require individuals in ministerial positions to be members of the religion of the association or organization; and (ii) religious associations and organizations may not require non-ministerial employees to be members of the religion, but such associations and organizations may follow their religious tenets in setting employment criteria.  (For example, a Jewish synagogue could prohibit employees from bringing non-Kosher food onto the premises.)  There is no exemption in the NJLAD for closely-held businesses to discriminate based on religious beliefs.

k.  The New Mexico Human Rights Law makes it unlawful for an "employer, unless based on a bona fide occupational qualification or other statutory prohibition, to refuse to hire, to discharge, to promote or demote or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of race, age, religion, color, national origin, ancestry, sex, sexual orientation, gender identity, pregnancy, childbirth or condition related to pregnancy or childbirth, physical or mental handicap or serious medical condition, or if the employer has fifty or more employees, spousal affiliation."  N.M. Stat. § 28-1-7(A).

l.  The New York Human Rights Law ("NYHRL") makes it unlawful to discriminate in employment on the basis of age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status,

marital status, or domestic violence victim status.  N.Y. Exec. L. § 296.1.

New York law provides an exemption to these requirements, which,

among other things, permits religious institutions to exercise a preference

in hiring for persons of the same faith so that those institutions can

effectuate their religious mission.  *Id.* § 296.11.

m.  The North Carolina Equal Employment Practices Act ("NC EEPA")

prohibits employment discrimination based on race, religion, color,

national origin, age, sex, or handicap.  N.C. Gen. Stat. § 143-422.2.  The

NC EEPA covers all North Carolina employers regularly employing 15

or more employees.  *Id.*  Executive Order No. 24 also prohibits

discrimination against State employees and employees of state

contractors on the basis of race, color, ethnicity, sex, National Guard or

veteran status, sexual orientation, or gender identity or expression.  The

Executive Order requires State contractors to put in place non-

discrimination protections for their employees and ensures that the State

provides the public with equal access to state services without

discrimination.

n.  The Pennsylvania Human Relations Act ("PHRA") prohibits employers

from discriminating in employment because of race, color, religious

creed, ancestry, age, sex, national origin, disability, and use of guide or

support animals by employers, employment agencies, labor organizations

and others.  43 Pa. Stat. § 953.  Religious employers are excluded from

the definition of employer in the PHRA for the purposes of religious

discrimination.  *See id.* § 954(b).  Religious employers are permitted to discriminate on the basis of sex when it is a "bona fide occupational qualification because of the religious beliefs . . . of the corporation or association."  *Id.* § 955(a).  But religious organizations are not exempt from the PHRA if they contract with the Commonwealth.  *See* 16 Pa. Code §§ 49.1, 49.2, 49.101.  Furthermore, Pennsylvania Executive Order 2016-04 provides that "[n]o agency under the Governor's jurisdiction shall discriminate against any employee or applicant for employment on the basis of race, color, religious creed, ancestry, union membership, age, gender, sexual orientation, gender identity or expression, national origin, AIDS or HIV status, or disability."

o.  Vermont's Fair Employment Practices Act ("VFEPA") prohibits employment discrimination on the basis of race, color, religion, national origin, sex, sexual orientation, gender identity, ancestry, place of birth, age, crime victim status, or physical or mental condition.  Vt. Stat. Ann. tit. 21, § 495.  Vermont law provides that the VFEPA "shall not be construed to prohibit or prevent any religious or denominational institution or organization, or" certain organizations that are "operated for charitable or educational purposes" from "giving preference to persons of the same religion or denomination or from taking any action with respect to matters of employment which is calculated by the organization to promote the religious principles for which principles for which it is established or maintained."  *Id.* § 495(e).

119.    The Final Rule is at odds with the carefully crafted balances struck in Plaintiffs' statutes and regulations, and harms Plaintiffs' interests in enforcing their own laws and furthering longstanding anti-discrimination policies.

120.    Because the Final Rule provides a variety of employers with a potential perceived license or defense to discriminate against various groups of individuals, it will require many Plaintiffs to bear greater enforcement and administrative costs to protect workers from discrimination in their jurisdictions, and to enforce state and local nondiscrimination mandates.

121.    Plaintiffs have agencies charged with enforcing anti-discrimination laws and furthering the longstanding public policy of anti-discrimination in employment.  For example:

a. The California Department of Fair Employment and Housing ("CADFEH") is charged with administering and enforcing the CAFEHA.

b. The Colorado Civil Rights Division has responsibility for enforcing Colorado law that prohibits employment discrimination.

c. The Connecticut Commission on Human Rights and Opportunities enforces the state's laws prohibiting employment discrimination.  Conn. Gen. Stat. § 46a-54.

d. The D.C. Office of Human Rights enforces the DCHRA.

e. The Illinois Department of Human Rights ("IDHR") is an agency of the executive branch charged with enforcing the IHRA.  *See* 775 ILCS 5/1, *et seq*.  The IDHR is empowered to investigate and mediate charges of discrimination in all matters under its jurisdiction.  In addition to its investigatory mandate, the IDHR issues guidance and provides technical

assistance to the public and develops outreach and education to promote learning and understanding of the IHRA.

f.   The Massachusetts Commission Against Discrimination ("MCAD") is an independent state agency that enforces the anti-discrimination laws of the Commonwealth through training, mediation, investigation, prosecution and adjudication.  MCAD is charged with receiving, investigating, and passing upon complaints of unlawful discriminatory acts based on protected class categories.  Mass. Gen. Laws ch. 151B § 3.  The Civil Rights Division of the Massachusetts Office of the Attorney General ("MA Civil Rights Division") also enforces the MAFEPL through investigation, prosecution, and mediation.  The MA Civil Rights Division works to remedy and end discrimination on the basis of protected class categories and ensure equal opportunity in employment.

g.   The Michigan Department of Civil Rights is charged with administering and enforcing Michigan anti-discrimination laws.

h.   The Minnesota Department of Human Rights ("MDHR") is charged with administering and enforcing the MHRA.

i.   The Nevada Equal Rights Commission ("NERC") addresses workplace discrimination.

j.   The New Jersey Division on Civil Rights enforces the NJLAD.

k.   The New Mexico Human Rights Commission ("NMHRC") is the agency in charge of enforcing the New Mexico Human Rights Act.  NMHRC

was created to eliminate discrimination and prejudice.  N.M. Stat. §28-1-
4.

l.  The New York State Division of Human Rights ("NYSDHR") is the
agency in charge of enforcing the NYHRL.  NYSDHR was created "to
encourage programs designed to ensure that every individual shall have
an equal opportunity to participate fully in the economic, cultural, and
intellectual life of the state; to encourage and promote the development
and execution by all persons within the state of such state programs;
[and] to eliminate and prevent discrimination in employment."  N.Y.
Exec. L. § 290.3.  NYSDHR enforces the Human Rights Law through the
investigation and adjudication of complaints filed by individuals as well
as NYSDHR-initiated complaints; the creation of studies, programs and
campaigns designed to inform and educate the public on the effects of
discrimination and their rights and obligations under the law; and the
development of human rights policies and proposed legislation for New
York.

m.  The Human Relations Commission administers and enforces the NC
EEPA and has the authority to receive charges of discrimination from the
Equal Employment Opportunity Commission and investigate and mediate
charges of discrimination.  N.C. Gen. Stat. N.C. Gen. Stat. § 143-422.3.

n.  The PHRA establishes the Pennsylvania Human Relations Commission
("PHRC") as the administrative agency responsible for investigation of
claims of unlawful discrimination.  Additionally, the Pennsylvania Office

of the Attorney General holds statutory authority to prosecute

discrimination under the PHRA.

o. The Vermont Attorney General ("VT AGO") enforces VFEPA for all

employers except the State of Vermont.  The Vermont Human Rights

Commission ("VT HRC") enforces VFEPA as it relates to state

employment.

122.    For many of these agencies, employment is the area under which many or most

discrimination and harassment cases are filed.  For example:

a. In California, 22,584 complaints were filed with CADFEH in 2019.  Of

those, 20,430, or 90% were employment discrimination complaints.

b. In D.C., of 512 docketed cases in 2018, 393 were employment-related.

c. In Illinois, in Fiscal Year 2020, out of 2,933 charges filed with IDHR,

2,482 were employment charges, with an average cost of $4,360.99 per

case.

d. In Massachusetts, during Fiscal Year 2020 the MA Civil Rights Division

received 1,851 complaints of discrimination, 412 of which were related to

employment-based discrimination.  In Fiscal Year 2020, MCAD received

2,2778 complaints of discrimination, of which 2,223 were related to

employment-based discrimination.

e. In Michigan, 1,161 and 1,149 complaints alleging discrimination in

employment were filed in 2018 and 2019 respectively.

f. In Minnesota, 595 charges of discrimination were filed with MDHR in

Fiscal Year 2019, 411 of which were employment charges.

g. In New Jersey, in 2018, 310 of 423 filed discrimination complaints were employment discrimination complaints.  In 2019, 371 of 521 discrimination complaints were employment discrimination complaints.

h. In New York, 86% of the 6,229 cases filed during the 2018-2019 fiscal year were employment discrimination cases.

i. In Pennsylvania, in 2018-2019, of 1,182 cases filed, 925 cases were related to employment discrimination.

123.    The Final Rule will likely cause an increase in complaints of employment discrimination to many of Plaintiffs' agencies, which will in turn cause an increase in staffing needs and staff time spent on various stages of the complaint and resolution process, including agency investigation, administrative hearings, mediation, case resolution, and appeals.  For example:

a. CADFEH estimates that even uncomplicated discrimination complaints that are resolved relatively quickly would require CADFEH to expend at least between $1,346 and $2,308 each for Enforcement Division staff's time.  And if the complaint required extensive investigation or other work, was referred to the Dispute Resolution Division, required a Legal Division attorney to work on the complaint, and/or was administratively appealed, CADFEH would need to expend significantly more of its scarce resources.

b. MCAD reviews nearly every discrimination complaint it receives.  The particular facts and circumstances of each complaint dictate how much time is needed to review and resolve the matter.  For example, a

discrimination complaint that raises contested legal or factual issues will likely require more time to investigate than a complaint that is frivolous on its face.  Likewise, a complaint that proceeds through the full adjudicatory process—a probable cause determination, unsuccessful conciliation, public hearing and appeal—will require the agency to expend far more resources than a complaint that is dismissed following an investigation.  The MA Civil Rights Division also does at least a preliminary review of each complaint it receives.  The amount of time devoted to a complaint similarly depends on the facts and circumstances of the complaint.  At the least, Civil Rights Division staff must review the complaint and provide a written or verbal decision as to whether it will investigate.  Where the Division takes a case, it moves through investigation and, where appropriate, settlement discussions and litigation.  Some of the Division's larger employment discrimination cases have involved hundreds of hours of time by attorneys and staff.

c.  NJDCR anticipates that an increase in discrimination complaints would require more staff and/or existing staff time.  An administrative staff member salary range is between approximately $40,000 to $80,000.  With additional staff comes the need for additional hardware and technological services, such as laptops, printers/scanners, wifi service, cell phones, and cell phone service.  Furthermore, for cases that go to hearing or are appealed, NJDCR incurs attorney costs.

    d.  PHRC expects an increase in claims filed that it will need to investigate, which will take more staff time and money.

    e.  Both the VT AGO and VT HRC expect that an increase in discrimination complaints will require expanding their resources to account for the increased caseload.  That may take the form of increased staff and staff time.  It may also require the purchase of additional equipment for new staff, such as laptops, communications, and recording equipment.  In addition, an increased caseload will likely result in increased costs of each office's mediation program.  Each officer contracts with third-party mediators to resolve employment disputes.  Both could expect more mediation referrals and thus higher mediation costs.

124.    Additionally, Plaintiffs anticipate that they will need to expend resources to train staff on the Final Rule, including with respect to processes for escalating, analyzing, and resolving claims in the event that a complaint presents an issue of whether and how an employer claims a religious exemption under the Final Rule as a justification to a claim of discrimination. For example:

    a.  CADFEH will need to educate its enforcement and legal staff on the Final Rule and develop guidance for how to proceed if a religious organization is exempt under the Final Rule but not under FEHA.

    b.  IDHR expects that it will need to educate its staff on the Final Rule, including office support staff, intake investigators and unit administrators, case investigators and investigation supervisors, assistant managers and managers, staff attorneys and supervising attorneys,

leadership, and training institute and outreach staff.  It also anticipates
needing to develop policies and procedures with respect to handling
complaints that implicate the Final Rule.

c. NJDCR anticipates updating future trainings and materials to incorporate
changes made by the Final Rule.

d. NYSDHR needs to notify its regional offices throughout the state of the
Final Rule and its effects and instruct them to take and elevate complaints
that may implicate the expanded religious exemption to the legal
department of NYSDHR.

e. PHRC expects that educational outreach will be necessary to inform the
public that while an employer may be exempt under federal law, such
exemption may be unavailable pursuant to the PHRA.  PHRC also
expects that it will need to educate their staff and contractors on the Final
Rule.

125.     The Final Rule will likely cause confusion for employers with respect to their
obligations under federal and state law.  Many Plaintiffs are planning to and will likely need to
expend resources to clarify for employers, workers, and other stakeholders the difference
between state and local laws and regulations and the Final Rule.  For example:

a. MA Civil Rights Division is preparing to respond to any resulting
inquiries from employers requesting clarification of their legal
obligations under state law or from workers regarding their rights.  In the
event that it perceives significant confusion caused by the new Rule, the

49

        Civil Rights Division would publish guidance to advise employers and workers of the continuing applicability of protections under state law.

    b.   NYSDHR often provides guidance documents, resources, and other publications to educate the public on anti-discrimination rights and responsibilities.  It also provides a hotline to assist workers and employers in understanding the law.  NYSDHR anticipates that it may need to expend resources in training and outreach to ensure that workers, employers, and the general public are not confused in light of the divergence between State law and the Final Rule.

    c.   Vermont anticipates that its training for business or trade groups will need to account for changes because of the Final Rule.

126.    Moreover, some of Plaintiffs' agencies administer programs funded in whole or in part by federal grants and therefore monitor and conduct reviews for compliance with federal and state contracting requirements.  Such agencies will likely face increased administrative burdens because of the Final Rule.  Specifically, these agencies may need to address confusion about contracting requirements because of the Final Rule, or increase their monitoring efforts over grant subrecipients to ensure compliance with federal and state law.

**CLAIMS FOR RELIEF**
**FIRST CLAIM FOR RELIEF**
**(Violation of APA, 5 U.S.C. § 706(2)(A)—Arbitrary, Capricious, and Contrary to Law)**

127.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

128.   The APA requires courts to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

129.   For the reasons stated in ¶¶ 53-87 of this Complaint, the Final Rule is arbitrary, capricious, and contrary to law, and should be held unlawful and set aside.

130.   Defendants' violation causes ongoing harm to Plaintiffs and their residents.

**SECOND CLAIM FOR RELIEF**
**(Violation of APA, 5 U.S.C. § 706(2)(C)—In Excess of Statutory Authority)**

131.   Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

132.   Under the APA, courts must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

133.   For the reasons stated in ¶¶ 53-72 of this Complaint, the Final Rule exceeds DOL's statutory authority, and should be held unlawful and set aside.

134.   Defendants' violation causes ongoing harm to Plaintiffs and their residents.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court:

1.   Declare that the Final Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

2.   Declare that the Final Rule is in excess of the Department's statutory jurisdiction, authority, or limitations, or short of statutory right within the meaning of 5 U.S.C. § 706(2)(C);

3.   Vacate and set aside the Final Rule;

4.      Enjoin the Department and all its officers, employees, and agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever under the Final Rule;

5.      Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

6.      Grant other such relief as this Court may deem proper.


DATED: January 21, 2021                           Respectfully submitted,


                                                  LETITIA JAMES
                                                  *Attorney General of the State of New York*

                                                  By: */s/ Fiona J. Kaye*
                                                  Fiona J. Kaye
                                                  Amanda Meyer
                                                  Daniela Nogueira
                                                      *Assistant Attorneys General*

                                                  Office of the New York State Attorney General
                                                  28 Liberty Street
                                                  New York, NY 10005
                                                  (212) 416-8036
                                                  Fiona.Kaye@ag.ny.gov

                                                  *Attorneys for the State of New York*

XAVIER BECERRA
*Attorney General of the State of California*

By: */s/ Satoshi Yanai*
Satoshi Yanai*
   *Supervising Deputy Attorney General*

Office of the Attorney General of the State
of California
300 S. Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6400
satoshi.yanai@doj.ca.gov

*Attorneys for the State of California*

PHILIP J. WEISER
*Attorney General of the State of Colorado*

By: */s/ Eric R. Olson*
Eric R. Olson*
   *Solicitor General*

Office of the Colorado Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
eric.olson@coag.gov

*Attorneys for the State of Colorado*

WILLIAM TONG
*Attorney General of the State of Connecticut*

By: */s/ Joshua Perry*
Joshua Perry
   *Special Counsel for Civil Rights*

Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5372
Joshua.perry@ct.gov

*Attorneys for the State of Connecticut*

KARL A. RACINE
*Attorney General for the District of Columbia*

By: /s/ *Kathleen Konopka*
Kathleen Konopka
   *Deputy Attorney General, Public Advocacy
Division*
Alacoque Hinga Nevitt
   *Assistant Attorney General*

District of Columbia Office of the Attorney
General
400 6th Street, N.W.
Washington, DC 20001
(202) 724-6610
kathleen.konopka@dc.gov

*Attorneys for the District of Columbia*

KWAME RAOUL
*Attorney General of the State of Illinois*

By: */s/Kathryn Hunt Muse*
Kathryn Hunt Muse
  *Deputy Chief, Public Interest Division*

Office of the Illinois Attorney General
100 West Randolph Street
Chicago, IL 60601
(312) 814-3000
kmuse@atg.state.il.us

*Attorneys for the State of Illinois*

MAURA HEALEY
*Attorney General of the Commonwealth of Massachusetts*

By: */s/ Trini Gao*
Trini Gao*
  *Assistant Attorney General Fellow, Civil Rights Division*

Office of the Attorney General Maura Healey
One Ashburton Place
Boston, MA 02108
Trini.gao@mass.gov

*Attorneys for the Commonwealth of Massachusetts*

DANA NESSEL
*Attorney General of the State of Michigan*

FADWA A. HAMMOUD
*Solicitor General*

By: */s/ Zachary A. Risk*
Zachary A. Risk*
Joseph T. Froehlich
Debbie K. Taylor
  *Assistant Attorneys General*

Michigan Department of Attorney General
Labor Division – Payroll Fraud Enforcement Unit
PO Box 30736
Lansing, MI  48909
(517) 335-1950
RiskZ1@michigan.gov
FroehlichJ1@michigan.gov
TaylorD8@michigan.gov

*Attorneys for Dana Nessel, on behalf of the People of Michigan*

KEITH ELLISON
*Attorney General of the State of Minnesota*

By: */s/ Rachel Bell-Munger*
Rachel Bell-Munger*
  *Assistant Attorney General*

Minnesota Attorney General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 757-1272
rachel.bell-munger@ag.state.mn.us

*Attorneys for the State of Minnesota*

AARON D. FORD
*Attorney General of the State of Nevada*

By: */s/ Heidi Parry Stern*
Heidi Parry Stern
  *Solicitor General*

Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

*Attorneys for the State of Nevada*

GURBIR S. GREWAL
*Attorney General of the State of New Jersey*

By: */s/ Mayur P. Saxena*
Mayur P. Saxena
    *Assistant Attorney General*

124 Halsey Street, 5th Floor
Newark, New Jersey 07101
P.O. Box 45029-5029
(973) 648-3283
mayur.saxena@law.njoag.gov

*Attorneys for the State of New Jersey*

HECTOR BALDERAS
*Attorney General of the State of New Mexico*

By: */s/ Tania Maestas*
Tania Maestas*
   *Chief Deputy Attorney General*

New Mexico Attorney General
PO Drawer 1508
Santa Fe, New Mexico 87504
(505) 490-4060
tmaestas@nmag.gov

*Attorneys for Plaintiff State of New Mexico,
by and through Attorney General Hector
Balderas*

JOSHUA H. STEIN
*Attorney General of North Carolina*

By:  */s/ Sripriya Narasimhan*
Sripriya Narasimhan*
*Deputy General Counsel*
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
(919) 716-6421
SNarasimhan@ncdoj.gov

*Attorneys for the State of North Carolina*

JOSH SHAPIRO
*Attorney General of the Commonwealth of Pennsylvania*

MICHAEL J. FISCHER
NANCY A. WALKER
Chief Deputy Attorneys General

By: */s/ Ryan B. Smith*
Ryan B. Smith*
    *Deputy Attorney General*

Office of Attorney General
1600 Arch Street, Suite 300
Philadelphia, PA 19103
(215) 478-4593
rbsmith@attorneygeneral.gov

*Attorneys for the Commonwealth of Pennsylvania*


*\*Application for admission pro hac vice forthcoming*

THOMAS J. DONOVAN, JR.
*Attorney General of Vermont*

By: */s/ Benjamin D. Battles*
Benjamin D. Battles
    *Solicitor General*
Julio A. Thompson*
    *Assistant Attorney General, Civil Rights Unit*

Office of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-5500
Benjamin.Battles@vermont.gov

*Attorneys for the State of Vermont*